378 P.2d 487

**STATE of Arizona, Appellee,**

v.

**Richard SHAW, Appellant.**

No. 1265.

Supreme Court of Arizona,

En Banc.

Jan. 30, 1963.

Alexander Russin, and Robert O. Barber, Tucson, for appellant.

Robert W. Pickrell, Atty. Gen., Jack I. Podret, Pima County Atty., and Sidney L. Kain, Deputy County Atty., for appellee.

BERNSTEIN, Chief Justice.

This is an appeal by Richard Shaw from a conviction of the crime of grand theft. The evidence adduced at the trial showed the following facts: During the evening of September 11, 1961, two officers of the Pima County Sheriff's office were driving in an unmarked car to investigate an occurrence unrelated to this case. As they passed the fenced equipment yard of the Burris-White Machinery Company they observed an automobile parked at the side of the road with a micro-midget racer protruding from the trunk compartment. One of the occupants of the automobile was motioning for traffic on the road to drive past the parked or slowly moving automobile. The officers made a U-turn to investigate and as they drew abreast of the automobile they flashed their spotlight on its occupants. The automobile drove off at high speed and a chase ensued.

During the chase, the racer fell from the trunk of the automobile. Shortly there-

after the officers discovered the automobile abandoned in an empty lot. The officers traced the registration to Joseph Brown, and subsequently took him into custody. He admitted his part in taking the racer from the Burris-White yard and implicated Ronald Alkire and the defendant.

Brown pleaded guilty to a charge of accessory after the fact to the crime of grand theft, and received a suspended sentence. Alkire and the defendant were tried for the crime of grand theft. Alkire was acquitted and a mistrial granted as to the defendant. At a second trial defendant was found guilty and now appeals.

Defendant assigns as error the trial court's refusal to admit into evidence in its entirety defendant's Exhibit A. Exhibit A consisted of a confession signed by Joseph Brown who appeared as a state's witness at Shaw's trial. The portions excluded consisted of statements by the witness that he had committed crimes other than the one for which he was arrested. The defendant argues that Brown's admission of other crimes makes him dependent upon the leniency of the law enforcement officials for whom he was testifying in this case, and that the fact of such admissions may be shown to establish bias. In State v. Holden, 88 Ariz. 43, 352 P.2d 705 (1960) and State v. Little, 87 Ariz. 295, 350 P.2d 756 (1960) we held that a party could establish, by means of cross-examination, the existence of facts of a like nature which tended to show bias. Here, however, the defendant sought to establish these facts by the introduction of extrinsic evidence, rather than by cross-examination of the witness whose bias he desired to show. This raises the question whether a foundation for the introduction of evidence showing bias of a witness must be laid by first cross-examining the witness himself. This court, in Ross v. State, 23 Ariz. 302, 203 P. 552 (1922) adopted, without extended discussion, the majority rule that such a foundation is required. We have taken this opportunity to re-examine the ruling in that case, and now reaffirm it. A minority of the courts (see Annot. 16 A.L.R. 984 (1922)) hold that it is not necessary to establish a foundation for extrinsic evidence of bias by cross-examination. Some draw distinction between statements showing bias and acts showing bias, and require a foundation only in the former case. We think this distinction too tenuous to be material. One purpose of the foundational cross-examination is to give the witness a fair opportunity to explain statements which, standing alone, tend to show bias, People v. Sweeney, 55 Cal.2d 27, 9 Cal.Rptr. 793, 357 P.2d 1049 (1961). We think a witness should have the same opportunity to explain equivocal acts which, if unexplained, tend to show bias. A second reason for the rule is to promote expediency in the conduct of trials.

If facts showing bias are admitted by the witness, it is unnecessary to introduce the extrinsic evidence, McCormick, Evidence § 40 (1954); Ross v. State, supra. We think this is the principal justification for the rule, and if the court is satisfied that fairness will be maintained, it has discretion to dispense with the requirement of the foundational cross-examination where exceptional circumstances would make it unduly burdensome to require it (as, e. g. where the witness has been excused before the opposing party learns of facts showing bias, cf. State v. Carns, 136 Mont. 126, 345 P.2d 735 (Mont.1959)). We hold in this case it was not error to refuse to admit Brown's confession where there was no preliminary cross-examination of Brown in regard to the facts offered to show bias.

■ The defendant contends that he was improperly limited in his cross-examination of Brown as to the matters in the excluded portion of Exhibit A. He further contends that he was improperly limited in his cross-examination of another witness concerning the appearance of the defendant at the time he made oral confession, during a hearing before the court on the voluntariness of that confession. We are unable to find in the record any place where testimony on these matters was elicited by questions of defendant's counsel and excluded by the court. These assignments are without merit.

■■ The defendant was limited by the court in his attempt to cross-examine the investigating officer in regard to the matter the officer was enroute to investigate at the time the automobile containing the racer was observed. He argues that he should have been permitted to continue this line of cross-examination to determine if the officer had prior information that the three youths were going to enter the Burris-White equipment yard. He cites State v. Holden, 88 Ariz. 43, 352 P.2d 705 (1960) where we said:

"A defendant in a criminal prosecution has an absolute right to cross-examine an adverse witness, and if at all within the proper bounds, such right may not be unduly restrained or interfered with by the trial court." 88 Ariz. at 56, 352 P.2d at 715.

In response to questions which were permitted the witness testified that the case which he was investigating had no relationship to the charge against Shaw, and that he had no prior knowledge of an impending attempt to take the racer from the Burris-White yard. The defendant made no offer of proof to indicate what he expected the questioning to disclose. An absolute right to cross-examine "within the proper bounds" does not license the defendant for a fishing expedition into completely irrelevant matter.

■■ The defendant next contends that the trial court erred in considering the

defendant's conduct as a juvenile in pronouncing sentence in violation of A.R.S. § 8–228 which states:

"B. The disposition of a child or of evidence given in the juvenile court shall not be admissible as evidence against the child in any proceeding in another court, * * *."

Defendant in his brief states that at the time of pronouncing sentence the trial court received a report from the Adult Probation Officer of Pima County which contained a complete record of the defendant's activities as a juvenile offender. He further states that a transcript of the court's comments on sentencing will clearly reflect that the court considered and relied upon this report in setting the sentence. However, no such transcript was made a part of the record on appeal. We therefore consider the question of this use of juvenile records not appropriate to answer on the state of the record. Statements in the briefs do not substitute for evidence in the record. Hunter v. State, 43 Ariz. 269, 30 P.2d 499 (1934); cf. State v. Thomas, 81 Ariz. 124, 302 P.2d 261 (1956).

The defendant assigns as error the failure of the trial court to exclude evidence of the oral confession made by the defendant to the investigating officers after he was picked up by them. He contends that the confession was obtained during a period when the officers were violating A.R.S. § 8–221:

"A peace officer, other than the probation officer, who arrests a child under the age of eighteen years shall forthwith notify the probation officer, and shall make such disposition of the child as the probation officer directs."

The circumstances surrounding the taking of the confession were these: The defendant was picked up by two police officers at his home about 12:30 or 1:00 a. m. These officers had Alkire and Brown in their custody at the time. Defendant dressed and agreed to go with the officers to the sheriff's office. During the ride to the sheriff's office the defendant complained of being nauseated and the car was stopped so that he could throw up outside of the car. Defendant then indicated that it would be some time before he had to throw up and the group proceeded to the sheriff's office. The officers commenced questioning Alkire and Brown and defendant was left to sit in an outer office. The defendant asked the officers twice to take him to the hospital and complained that he had the "shakes" and was sick. One of the officers obtained two aspirin and gave them to the defendant. Defendant testified that he told the officers again that he had to throw up, that he was directed to a rest room where this was accomplished. Defendant took the stand and stated:

"Well, at first they tried to get me to admit to it. I told them I wouldn't.

And so they just let me sit out in the office. I kept getting sick, feeling worse, and I told Bernal that I didn't feel good and would he please take me to the hospital. And he says, 'I can't take you to the hospital or anywhere until I get some kind of a statement out of you.' But he said he would go up and get me some aspirin.

\* \* \* \* \* \*

"Q Did they tell you what they were charging you with?

"A No they didn't.

"Q Did anyone, either Officer Dunn, Bernal or Officer Russel ever advise you what you were being charged with?

"A No they didn't.

"Q Did any one of these officers ever say to you you are being placed under arrest and being charged with a crime?

"A No.

"Q Did Officer Bernal ever offer you leniency if you would admit to participating in any alleged crimes that evening?

"A Well, I finally got so sick I felt like I was going to pass out. So I told Bernal that I'd admit to it if

he'd either take me to Mother Higgins [juvenile home] or the hospital. And he said all right."

Each of the officers stated he had not threatened the defendant nor promised him leniency if he would make a statement. The defendant was taken to the Mother Higgins Home about 3:30 to 4:00 o'clock a. m. During the two and a half to three hours the defendant was in the custody of the sheriff's officers no attempt was made to call a probation officer because they "didn't think it was necessary." [1]

■ The philosophy which inspired creation of the juvenile court, and statutes implementing it, is that the state recognizes that in the majority of cases involving antisocial behavior (including criminal offenses) on the part of the youthful offenders, there is both a responsibility and an opportunity for the state, through special treatment in a non-criminal proceeding, to redirect and rehabilitate these young people. This operates for the benefit of the individual, and for society as a whole. However, in many states, as in Arizona, it is also recognized that there are certain individuals still within the chronological classification as juveniles, for whom this special treatment is futile. The juvenile court therefore may refuse to continue its juris-

1. The investigating officers knew at all times that Shaw was a juvenile. Shaw's father testified that when the officers arrived to pick up Richard, he (the father) asked if they had a warrant for his arrest. They replied that they did not need one as he was a juvenile.

diction in such cases, and may remand these individuals for regular proceedings in the criminal court. Under the law in Arizona, until the juvenile court, which has exclusive jurisdiction of all delinquent children or children accused of crime,[2] has considered the matter and decided that the particular individual is not one who will benefit from its special treatment, a child offender remains in the juvenile jurisdiction.

■ While under the juvenile court jurisdiction, a child is under certain disabilities not attaching to an adult.[3] He is not entitled to be released on bail; he does not have the right of trial by jury, or right of compulsory process to compel the attendance of witnesses on his behalf guaranteed by the Arizona Constitution in criminal prosecutions. To compensate for some of these disabilities, the juvenile statutes provide that the juvenile probation officer shall act as a representative in his behalf,[4] and further that if he is arrested by a peace officer, such officer "shall forthwith notify the probation officer, and shall make such disposition of the juvenile as the probation officer directs." [5]

The need for special treatment begins at the instant the juvenile is contacted by peace officers and this was recognized by the legislature. A few hours of the treatment sometimes accorded mature and hardened criminals can give the impressionable mind of a youth an indelibly warped view of society and its interest in him.

That the youthful offender stands before the police interrogators in a different position from that occupied by the mature criminal is recognized. In Oklahoma, confessions of juveniles obtained in the absence of parents or guardian or counsel are inadmissible in evidence, because such defendants are deemed incapable of waiving constitutional and statutory safeguards, unless it appears beyond a reasonable doubt that the minor offenders fully understand the effects of such a waiver, Olivera v. State, 354 P.2d 792 (Okl.Cr. (1960)).

Quite recently the United States Supreme Court held that the admission into evidence of a confession of a juvenile obtained during a five day period when he had seen no friendly adult violated due process standards, although the boy had been informed of his right to counsel, and although the confession was corroborated by earlier

---

2. Ariz.Const. Art. 6, § 15, A.R.S.
3. Moreover, he may be arrested by any peace officer not only if he is violating the law, but if he is "reasonably believed to be a fugitive from his parents or from justice," or if his "surroundings are such as to endanger his health,

morals or welfare unless immediate action is taken," A.R.S. § 8–221, subd. B.
4. A.R.S. § 8–204, subd. C, "He shall: 1. Look after the interests of neglected, delinquent and dependent children of the county. * * *"
5. A.R.S. § 8–221, subd. A.

statements, Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). A recognized text on the subject of juvenile delinquency states:

"Because of the child's presumed immaturity, special safeguards should be thrown around a police officer's interview with a child in investigating a delinquent act. In certain situations, depending on the age of the child and the act committed, waiver to criminal court may be a possibility. Moreover at the time of the interview, it is not known whether or not the court specializing in children's cases will retain jurisdiction over the case if a petition is filed, or will waive its jurisdiction and permit the child to be tried in a criminal court. Therefore, it cannot always be assumed that the police interview will lead only to a noncriminal proceeding.

Before being interviewed, the child and his parents should be informed of his right to have legal counsel present and to refuse to answer questions if he should so decide. In cases where waiver is possible, he should also be cautioned that if he answers, his answers may be used not only before the specialized court but possibly in a criminal court. Where a child has been questioned alone by a police officer, without having been given an opportunity to secure the presence of his parents, guardian, or counsel, his statements during such interview should be presumed to have been induced either by the child's immaturity or by the idea that they would be used only in the specialized court and they should, therefore, unless the presumption is overcome, be excluded from admission before a criminal court in which the child may be a defendant." Glueck, The Problem of Delinquency p. 539 (1959) (quoting from a publication of the U. S. Government Children's Bureau.)

Unquestionably, the purpose of A.R.S. § 8–221 was to alter the usual method of handling persons arrested on suspicion or for investigation of criminal activities when those persons are juveniles.[6] Moreover, it is apparent that this alteration of methods was intended to protect the interests of juveniles rather than to facilitate police investigations.[7] Since a major feature of

6. A.R.S. § 8–221 was not intended to accomplish the segregation of juveniles from adult offenders in detention facilities. This purpose is effected by A.R.S. § 8–226, subd. B:

"A child, pending a hearing, shall not be placed in an apartment, cell, place of confinement, court room or vehicle or transported in company with adults charged with or convicted of crime."

7. We are aware of the problem confronting law enforcement officers in their investigation of a crime when they have good reason to believe an apprehended juvenile is involved therein. On the one hand, they are anxious to obtain informa-

the usual treatment of newly arrested persons is interrogation, it follows that one of the purposes of A.R.S. § 8–221 is to protect the juvenile from the adverse effects of this procedure.

■ We have carefully considered the possible means of enforcing the policy expressed in A.R.S. § 8–221 and have concluded that the means most in harmony with the purposes expressed and implicit in that section is to preclude the admission of statements obtained by the persuasion of police during the period when the section is being violated.[8] We find support for this ruling in the cases cited above and others in which statements of juveniles are excluded in recognition of the factors of immaturity and fear in the mind of the juvenile which may have induced such statements, e. g. Felder v. State, 17 Ala.App. 458, 85 So. 868 (1920) (based upon an Alabama statute reflecting this policy).

■ Because of the importance of this ruling, we feel it necessary to explain in some detail the position we now take. A.R.S. § 8–221 requires that following the arrest of a juvenile by an officer other than the

probation officer, such officer shall "forthwith" notify the probation officer and follow his instructions for the disposition of the child. "Forthwith" means "immediately, without delay, promptly", Harbel Oil Co. v. Steele, 80 Ariz. 368, 298 P.2d 789 (1956). While the statute does not permit any period of wilful delay, however short, it is complied with if the arresting officer notifies the probation officer at his earliest reasonable opportunity. Moreover, we recognize that a probation officer may not always be immediately available in the less populated counties of the state. A period of detention which otherwise complies with the statutes and during which reasonable efforts are being made to contact the probation officer does not violate A.R.S. § 8–221.

■ Voluntary statements made during transportation from the scene of arrest or during a period of detention when A.R.S. § 8–221 is not being violated are admissible in accordance with the usual rules of evidence. A conscious effort by the police to take advantage of unavoidable delays in contacting the probation officer, by subjecting the juvenile to interrogation, is con-

---

tion by interrogation concerning any connection which he may have with the crime, and know the advantage of conducting this interrogation before the suspect has had time to dissemble after reflection. On the other hand, they must realize that ordinarily the factor of immaturity induces a greater sense of fear and insecurity on the part of a juvenile, which may amount to unreasonable pres-

sure in inducing statements without real understanding of his legal rights.

8. This is not as extreme a rule as some that have been adopted to enforce the provisions of juvenile statutes. Cf. Willis v. Cochran, 131 So.2d 728 (Fla. 1961) (failure to notify parents of charge against juvenile as required by statute held to invalidate conviction).

trary to the policy and spirit of A.R.S. § 8–221 and statements obtained by such a procedure are inadmissible.

We consider distinguishable cases in other jurisdictions which have held that a short period of detention and interrogation prior to taking the juvenile to a detention home (where the governing statutes required he be taken immediately) was not illegal. The policy of the controlling statutes in those cases was directed toward the segregation of juveniles from adult offenders. A statutory expression of a policy to protect juveniles from the adverse effects of police interrogation was not a feature of these cases. See, e. g. State v. Smith, 32 N.J. 501, 161 A.2d 520 (1960); Harper v. Strange, 81 U.S.App.D.C. 349, 158 F.2d 408 (D.C.Cir.1946).

■ Nor is the salutary procedure of investigating the details of a youth's conduct before charging him with an offense, as expressed in these cases, at issue here. Our rule does not prevent the police from questioning a juvenile—it only prevents them from subjecting the juvenile to formal interrogation without permission of the person appointed by law to see that the interrogation procedure is conducted in a manner consonant with the purposes and policies of juvenile rehabilitation. The legislature has made the decision of public policy in providing for a representative in the person of the probation officer. Certainly in the proper discharge of his duties, the latter would not be acting in the interest of the juvenile or of society merely by preventing interrogation—he could and should only prevent overzealous pressure.

■ In the present case the defendant's statement was obtained during a period when no effort was made to comply with A.R.S. § 8–221 because the officers "didn't think it was necessary." Under the rule expressed herein the admission of this confession was error.

The judgment is reversed and the case remanded for a new trial.

STRUCKMEYER, JENNINGS and LOCKWOOD, JJ., concur.

UDALL, Vice Chief Justice (dissenting).

The majority have upheld the rulings and the conduct of the trial by the lower court in reference to all the assignments of error with the exception of the assignment which is addressed to the failure of the trial court to exclude evidence of an oral confession made by the defendant to the investigating officers. In that regard it is my opinion that the officers did not violate A.R.S. § 8–221 in obtaining the confession voluntarily made by the defendant.

I am in substantial agreement with the facts outlined in the majority opinion. However, I find that the following material facts were not mentioned in the opinion

which I believe should be included. For instance, the majority fails to state that when the defendant was arrested it was by Officer Joe Dunn, an investigator for the Juvenile Division of the Sheriff's Office, and that at the time of the arrest defendant's father and mother were present and were told the reasons for his being taken into custody. After his arrest defendant was detained at the sheriff's office from about 1:00 a. m. to 3:30 a. m. September 12, 1961, and during the time of his detention the defendant made a voluntary statement concerning his participation in the alleged crime which the lower court allowed in evidence over the objection of defense counsel. The facts show that the officers did not threaten or coerce the defendant into making the statement nor did they make any promise to him as a matter of inducement for him to make said statement. The defendant gave some evidence that one of the officers said if he would give them a statement he would be taken to the hospital. However the testimony of the officers was otherwise, and the jury being the judges of the fact resolved this issue in favor of the state and against the defendant.

The majority hold that when the arresting officers failed to notify the probation officer of the detention of the juvenile they violated the provision in A.R.S. § 8–221(A), which states:

> "A peace officer * * * who arrests a child under the age of eighteen years shall *forthwith* notify the probation officer * * *." (Emphasis supplied.)

In support of their position the majority cites the case of Olivera v. State (Okl.Cr. 1960), 354 P.2d 792 for the proposition that "confessions of juveniles obtained in the absence of parents or guardian or counsel are inadmissible in evidence, because such defendants are deemed incapable of waiving constitutional and statutory safeguards." But rather than support the position taken by the majority it supports the position I am urging. I note on page 794 of that opinion that failure to advise a juvenile of his rights prior to his answering questions

> "should be considered as affecting the admissibility of any statements made by him purporting to be a confession of guilt." [1]

---

1. In the Oklahoma case the facts are significant. I quote from page 794: "The defendants offered no proof as to the contention of the involuntary character of the confessions, and the contention that they were obtained by promises made by the officers. To the contrary, the officers clearly established that the confessions were not only voluntarily made, but that they were not the result

of promises, threats, intimidation, or abuse. * * * There is nothing in the State's case that supports the defendant's contentions, except that they were 17 and 18 years of age. We are of the opinion that this fact standing alone is not sufficient to void a confession when the same . is validly made under the law."
Such is the case before us. The fact that a probation officer was not contacted

**52**

It does not say that it will bar the admission of the confession and in that case the confession was admitted and the Supreme Court held this was harmless error if error at all.

The circumstances surrounding the taking of the confession from Shaw including the fact that the arresting officer was assigned to juvenile work and that the parents of the defendant were present at the time of the arrest and were told the reasons for taking the defendant into custody were before the trial court. In the absence of an abuse of discretion, or at least being shown an abuse, we should conclude that the court considered all the facts and felt none were compelling enough to bar admission of the confession.

Next the case of Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L. Ed.2d 325 (1962) is cited in support of the majority opinion. Again I disagree that the divided opinion handed down by the Supreme Court is authority for the ruling the majority are making in this case since the facts are entirely dissimilar. There the child involved was 14 years of age and had been held for five days during which time he saw no lawyer, parent, or other friendly adult. A conviction was reversed by the U. S. Supreme Court but in a split decision of four to three. This is vastly different from the facts involved in this

case where a 17-year-old boy voluntarily made a confession during a short two and one-half hour period.

The final case relied on by the majority is the case of Felder v. State, 17 Ala.App. 458, 85 So. 868 (1920). In my opinion this old case does not support the ruling of the majority. There the juvenile involved was a female child 15 years of age and in cross-examination the deputy sheriff who had the juvenile in custody testified as follows:

"Q Did you make any promise to her?

"A Yes, sir, I told her, I said: 'You got the ring, and I know it. If you don't give me up the ring, you might have to go off for it. If you get me the ring, I will turn you over to the juvenile people'—and she went around the house and got it."

It is apparent that this statement, made by the officer while the child was in his custody, was a threatening, coercive statement and the Supreme Court unquestionably was right in ruling it out as not voluntary.

The majority recognizes that the extremely liberal rule adopted in the opinion will be difficult to adhere to in the rural counties of Arizona. It is pertinent to note that 10 to 12 of the 14 counties of the state have only one probation officer, and in many

sooner than two and one-half hours after the arrest "standing alone is not sufficient

to void a confession when the same is validly made under the law."

situations it will be almost impossible to contact the probation officer within a period of several hours or even a day. However, I take it from the tone of the opinion that if a voluntary statement was made during such time the statement would be admissible.

It is fundamental that the law must be administered uniformly in all of the counties of the state and the law should not be interpreted so as to put special emphasis on a strict interpretation as to what constitutes a reasonable time in Maricopa County as distinguished from a rural county. The crux of the case is whether the officers did "forthwith" report the matter to the probation officer as that expression has been interpreted by the courts.[2] Applying that

interpretation of this term "forthwith" to the circumstances of the case at bar there seems to have been no violation of the law by the mere holding of the defendant for only two and a half hours during the early morning hours while the officers had other matters to which they had to attend. This was not an unreasonable delay in complying with the provisions of the statute.

One of the arresting officers who held the defendant at the sheriff's office from 1 to 3:30 a. m. stated he had not contacted the probation officer during this period because "I didn't think it was necessary." The majority makes inferential comment on this fact. The record does not disclose nor did either of the attorneys question him as to why he didn't think it was necessary. The

2. This court, in a civil case involving a statute authorizing the seizure of cattle by inspector for purpose of determining title, defined the term "forthwith" as used in the statute with regard to the time the inspector should report the seizure to the clerk of the superior court as follows:

"The word 'forthwith' does not mean within any particular time, but substantially with as much speed as is reasonably possible under the circumstances of the case." State v. McEuen, 42 Ariz. 385, 397, 26 P.2d 1005, 1009 (1933).

See United States v. Bell, 48 F.Supp. 986 (1943) in which the Federal District Court, Southern District, California, used the same definition in a criminal action.

In a criminal action in North Carolina as recently as 1961 it was said with regard to the meaning of the terms "forthwith" and "immediately":

"Such terms never mean the absolute exclusion of any interval of time, but

mean only that no unreasonable length of time shall intervene before performance." State v. Ball, 255 N.C. 351, 121 S.E.2d 604 (1961).

In State v. Smith, 32 N.J. 501, 161 A.2d 520 (1960) in which a confession was taken from a juvenile during a period in which he claimed to have been illegally detained it was said at page 537 of 161 A.2d:

" * * * [W]e do not conceive that R.R. 6:8–3(b) and (c), in speaking of an officer who has taken a juvenile into custody without process making 'immediate arrangements' to have him removed to his home or place in an approved detention facility, requires that such *must necessarily be done before the police are afforded a reasonable opportunity to question, where that course is desirable or important.*" (Emphasis supplied.)

record shows that both officers were busy questioning the two adult prisoners who were arrested at the same time as the juvenile, and it is more reasonable to conclude that the officer didn't think it was necessary at that hour of the night—when they were busily engaged in discharging their duties—than it is to conclude that they were deliberately acting in defiance of the law. Every presumption should be made in favor of an officer discharging his duty, and every inference from the testimony should be given to maintain the integrity of the officer. Lorenzen v. Superior Court, 150 Cal.App.2d 506, 310 P.2d 180 (1957).

The judgment should be affirmed.